```
            IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF OHIO
                      EASTERN DIVISION
```

William Tilton Mercer,         :

     Plaintiff,             :

   v.                          :      Case No. 2:12-cv-0607

Commissioner of Social         :      JUDGE ALGENON L. MARBLEY
   Security,                          Magistrate Judge Kemp
                                 :
     Defendant.

### REPORT AND RECOMMENDATION

#### I.  Introduction

Plaintiff, William Tilton Mercer, filed this action seeking review of a decision of the Commissioner of Social Security denying his application for supplemental security income.  That application was filed on January 26, 2009, and alleged that plaintiff became disabled on January 1, 2009.

After initial administrative denials of his applications, plaintiff was given a hearing before an Administrative Law Judge on January 31, 2011.  In a decision dated March 14, 2011, the ALJ denied benefits.  That became the Commissioner's final decision on May 16, 2012, when the Appeals Council denied review.

After plaintiff filed this case, the Commissioner filed the administrative record on December 17, 2012.  Plaintiff filed his statement of specific errors on January 16, 2013.  The Commissioner filed a response on March 21, 2013.  Plaintiff filed a reply on April 5, 2013, and the case is now ready to decide.

#### II.  Plaintiff's Testimony at the Administrative Hearing

Plaintiff, who was 45 years old at the time of the administrative hearing and who completed the eleventh grade, testified as follows.  His testimony appears at pages 44-65 of the administrative record.

Plaintiff testified that he last worked full-time in 1997. He had medical problems while working, including issues with his back, stomach and shoulders. He described continuous pain and an inability to get along well with people. He also had side effects from medication and problems remembering things.

Plaintiff stated that he had pain from his shoulders to his ankles. He also said his shoulders dislocate easily and that his hips and knees went "in and out." Activity of any sort hurts after fifteen or twenty minutes. His sleeping was affected by pain as well. He also suffered from difficulty concentrating.

In a typical day, plaintiff would take his medications as soon as he got up, and would wait two to three hours prior to their taking effect. Afterwards, he might do some household chores and watch television. He was unable to pursue his former hobbies, which included hunting and working on cars. He could do chores such as vacuuming or laundry on a sporadic basis but could not do any yard work. Lifting over five pounds stretches his shoulders to the point they might dislocate.

Plaintiff believed he could stand for an hour, after which he would need to sit for at least 45 minutes. He could walk 20 to 30 yards and sit for half an hour or 45 minutes, but not comfortably. He could not bend and could climb stairs only slowly. He also had a problem with dropping objects. He did not often leave his house and did not socialize with friends. Additionally, he suffered anxiety attacks several times each day.

### III.  The Medical Records

The medical records in this case are found beginning on page 262 of the administrative record. The Court summarizes the pertinent records as follows.

Office notes from plaintiff's treating physician, Dr. Stephen Ulrich, and his wife, Dr. Theresa Ulrich, show that they had treated plaintiff since at least 2006. A January, 2006 note shows diagnoses of pleurisy, abnormal weight gain, and bipolar affect. At that time, plaintiff was taking Zyprexa and Effexor.

Plaintiff was later treated for back sprain and arthritis as well as bipolar disorder, asthma, and anxiety. He had reported symptoms of loss of concentration and difficulty sleeping as well as social withdrawal. Other medications such as an inhaler, Vicodin, and Depakote were added over time. (Tr. 280-309).

Plaintiff was interviewed by Dr. Rowland, a psychologist, on May 4, 2009. Plaintiff told Dr. Rowland he suffered from fibromyalgia, joint problems, bipolar disorder and chronic bronchitis. He reported life-long mood difficulties including both rage and depression, trouble sleeping, lack of interest, and sadness. His symptoms were somewhat controlled by medication but he tended to decompensate under stress. He also described daily anxiety attacks. Dr. Rowland noted that plaintiff appeared to have a low energy level and showed some signs of anxiety. His performance on the mental status examination showed "severe difficulties with attention and concentration." Dr. Rowland rated plaintiff's GAF at 55 and thought he had moderate impairments in his ability to remember and follow instructions and to maintain attention, concentration, persistence and pace to perform routine tasks. He had a marked impairment in his ability to relate to others and to withstand the stress of daily work. (Tr. 316-25). Dr. Goldsmith, a state agency reviewer, agreed generally with Dr. Rowland's diagnoses, but viewed plaintiff's impairment in the areas of concentration, persistence and pace and in dealing with work pressure as only moderate. (Tr. 326-43).

Plaintiff was also examined with respect to his physical impairments. That examination was done by Dr. Weaver on May 11, 2009. Dr. Weaver reported that plaintiff had been diagnosed with fibromyalgia in 1995 and had been treated by Dr. Ulrich since then. He also was diagnosed with COPD and was being treated with inhalers. Both conditions affected his stamina. He told Dr.

Weaver about his bipolar disorder as well.  On examination, plaintiff walked with a normal gait and did not exhibit any shortness of breath.  He did exhibit tenderness at various trigger points and he had some restrictions in his range of motion in the shoulders and hips.  His back was painful at the extremes of motion testing.  Dr. Weaver thought plaintiff was capable of occasional light lifting and carrying, handling objects, hearing, speaking, following directions, and travel. (Tr. 344-52).

    Dr. Neiger, a state agency reviewer, also commented on plaintiff's physical residual functional capacity.  She thought that he could lift and carry twenty pounds occasionally and ten pounds frequently, could stand or walk for up to six hours in a workday, and could never climb ropes, ladders or scaffolds.  She commented that based on the fact that plaintiff had a normal gait and did not become short of breath at the examination conducted by Dr. Weaver, his statements about disabling pain were only partially credible.  She did, however, note that he had more than 11 of the 18 trigger points for fibromyalgia.  (Tr. 361-69).

    The file contains additional office notes from Dr. Ulrich. One of the new diagnoses in 2009 was restless leg syndrome.  (Tr. 433).  Otherwise, the notes indicate the same diagnoses and continuation of medication for plaintiff's various conditions. Dr. Ulrich did refer plaintiff for a sleep study.  The report of that study shows that plaintiff described a long history of difficulty sleeping or interrupted sleep, with restless leg syndrome having worsened over the past two years.  His medication was changed in an effort to reduce his restless leg syndrome. (Tr. 500-03).

    Dr. Ulrich completed a mental residual functional capacity form on February 20, 2010, and a physical residual functional capacity report on February 25, 2010.  On the former, he

indicated that plaintiff had extreme limitations in the areas of activities of daily living and maintaining social functioning, also had severe problems with concentration, persistence and pace and with decompensation, and, among other things, that he could not complete a workday or workweek without interruption from psychologically-based symptoms.  On the latter, Dr. Ulrich described plaintiff's capabilities as being limited to lifting at the sedentary level, but he also said that plaintiff could sit less than six hours in the workday, was limited in his ability to push and pull, could never climb, balance, kneel or crawl, and could reach only occasionally.  He did not think plaintiff could do sedentary work on a sustained basis.  (Tr. 520-27).  Dr. Ulrich expressed much the same opinion in an office note from February 5, 2010.  (Tr. 529-30).

### IV.  The Vocational Testimony

A vocational expert, Dr. Oestreich, also testified at the administrative hearing.  His testimony begins at page 65 of the record.

Dr. Oestreich classified plaintiff's past work as a muffler mechanic as semi-skilled and medium.  Plaintiff had also worked as a molder, which was unskilled and medium.

Dr. Oestreich was asked questions about someone who could work at the light exertional level who could never climb ladders, ropes and scaffolds.  He responded that such a person could not do plaintiff's past work but could do about 90 percent of the light jobs in the economy.  If the person were limited to simple routine and repetitive tasks which allowed only brief and superficial interaction with the public, coworkers and supervisors, the percentage of light jobs the person could do would be slightly reduced.  If, however, that same person were limited to a range of sedentary work and could not do fine manipulation, there would not be any jobs the person could

perform.

### V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 25 through 34 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that plaintiff had not engaged in substantial gainful activity from his application date of January 26, 2009 through the date of the decision. As far as plaintiff's impairments are concerned, the ALJ found that plaintiff had severe impairments including degenerative disc disease, osteoarthritis, asthma, fibromyalgia, and bipolar disorder. The ALJ also found that plaintiff's impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments (20 C.F.R. Part 404, Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation process, the ALJ found that plaintiff could work at the light exertional level except that he could never climb ladders, ropes or scaffolds. Also, he was limited to simple, routine and repetitive work with involved only brief and superficial interaction with the public, coworkers, and supervisors. The ALJ found that, with these restrictions, plaintiff could not perform his past relevant work but he could perform jobs identified by the vocational expert, such as housekeeper, assembler, and inspector. There were almost 400,000 such jobs in the national economy. Consequently, the ALJ concluded that plaintiff was not entitled to benefits.

### VI. Plaintiff's Statement of Specific Errors

In his statement of specific errors, plaintiff raises two general issues. He contends (1) that the ALJ should have found his insomnia and restless leg syndrome to be severe impairments; and (2) that the ALJ improperly evaluated the medical evidence, particularly the treating and examining physicians' opinions.

-6-

The Court generally reviews these contentions under this legal standard:

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).

Turning to the first claimed error, it is true that the ALJ did not recognize either insomnia or restless leg syndrome as severe impairments, meaning impairments which would be expected to interfere with a Plaintiff's ability to work regardless of "whether the claimant was sixty-years old or only twenty-five, whether the claimant had a sixth grade education or a master's

degree, whether the claimant was a brain surgeon, a factory worker, or a secretary." Salmi v. Secretary of H.H.S., 774 F.2d 685, 691-92 (6th Cir. 1985).  It is equally true, however, that the failure to recognize certain impairments as severe is, at most, harmless error if the ALJ takes any limitations caused by those impairments into account when assessing a claimant's residual functional capacity.  See, e.g., Taylor v. Astrue, 2012 WL 870770, *5 (S.D. Ohio March 14, 2012), adopted and affirmed, 2012 WL 1268178 (S.D. Ohio April 13, 2012), citing Maziarz v. Sec'y of HHS, 837 F.2d 240, 244 (6th Cir. 1987).  As the Court of Appeals said in Maziarz, "[s]ince the Secretary properly could consider claimant's cervical condition in determining whether claimant retained sufficient residual functional capacity to allow him to perform substantial gainful activity, the Secretary's failure to find that claimant's cervical condition constituted a severe impairment could not constitute reversible error." Id.  Plaintiff has not identified any limitations posed by those conditions beyond what is contained in Dr. Ulrich's opinions about the combined effect of his impairments.  If the Commissioner had good reason to reject those opinions, this issue is moot.  The Court therefore turns to the second claimed error.

It has long been the law in social security disability cases that a treating physician's opinion is entitled to weight substantially greater than that of a nonexamining medical advisor or a physician who saw plaintiff only once.  20 C.F.R. §404.1527(d); see also Lashley v. Secretary of H.H.S., 708 F.2d 1048, 1054 (6th Cir. 1983); Estes v. Harris, 512 F.Supp. 1106, 1113 (S.D. Ohio 1981).  However, in evaluating a treating physician's opinion, the Commissioner may consider the extent to which that physician's own objective findings support or contradict that opinion.  Moon v. Sullivan, 923 F.2d 1175 (6th Cir. 1990); Loy v. Secretary of HHS, 901 F.2d 1306 (6th Cir.

1990). The Commissioner may also evaluate other objective medical evidence, including the results of tests or examinations performed by non-treating medical sources, and may consider the claimant's activities of daily living. Cutlip v. Secretary of HHS, 25 F.3d 284 (6th Cir. 1994). No matter how the issue of the weight to be given to a treating physician's opinion is finally resolved, the ALJ is required to provide a reasoned explanation so that both the claimant and a reviewing Court can determine why the opinion was rejected (if it was) and whether the ALJ considered only appropriate factors in making that decision. Wilson v. Comm'r of Social Security, 378 F.3d 541, 544 (6th Cir. 2004).

The starting point of this analysis is always the rationale provided by the ALJ, since the Court must rely on the ALJ's statement of reasons why a treating source opinion was rejected and may not attribute reasons to the ALJ which are not stated in the administrative decision. See, e.g., Williams v. Astrue, 2009 WL 2148625, *8 (S.D. Ohio July 14, 2009) ("It is highly doubtful that the Commissioner's post-hoc rationalizations can be the sole basis to affirm an ALJ's decision when the ALJ has failed to weigh a treating medical source opinion as required by the Regulations"). Here, the ALJ explained her reasoning as follows.

First, on the subject of plaintiff's physical limitations, the ALJ commented that "there is little medical evidence to support the claimant's allegations of completely disabling symptoms." (Tr. 30). She noted that he "was able to walk forty feet and perform physical activities at his physical consultative examination ... without an issue." Id. She also interpreted Dr. Weaver's report as supporting a finding that plaintiff could do light work, which she saw as both compatible with his performance at the physical examination and "with his active lifestyle playing with his pet and hunting." Id. She gave little weight to Dr. Ulrich's "broad statement of disability...

-9-

because it is contrary to the objective medical evidence and the treatment notes as a whole." (Tr. 31). The only specific portion of the evidence she cited was Dr. Weaver's report, which she interpreted as having "found no such significant limitations." Id. She concluded that "Dr. Ulrich's assessment of disability and the claimant's inability to work are unsupported and involve an issue reserved for the Commissioner. Thus, no significant weight is accorded to his opinion that the claimant was totally incapacitated." Conversely, she stated that she found Dr. Weaver's opinion "quite persuasive" and gave it "great weight ...." Id. The opinion of the state agency reviewer, Dr. Neiger, is not mentioned in this section (or, indeed, in any section) of the administrative decision.

    The Court finds this reasoning seriously flawed in several respects. First, the ALJ appears not to have reasonably interpreted Dr. Weaver's report. Although he stated that plaintiff could engage in occasional light lifting and carrying, he ruled out, or placed significant limits on, plaintiff's ability to perform "physical activities involving sustained sitting, standing, walking [and] climbing ...." (Tr. 348). A full range of work at the light exertional level, however, involves up to six hours of walking or standing in an eight-hour day, which seems to be sustained activity. It is also not clear how much weight, if any, Dr. Weaver believed plaintiff could lift or carry on a frequent basis - his report restricted plaintiff in performing repetitive (as well as moderate to heavy) lifting and carrying activities, and Dr. Weaver said plaintiff could do only "occasional" light lifting and carrying. Again, however, light work involves the frequent lifting and carrying of up to ten pounds, and the ALJ found that plaintiff could do that. The ALJ clearly adopted Dr. Neiger's evaluation down to the last detail, but never explained why. This misinterpretation of, or failure to explain the ambiguities in, Dr. Weaver's report substantially

undercuts the ALJ's rationale for rejecting Dr. Ulrich's opinions, since the strongest reason given for that rejection was the great weight assigned to Dr. Weaver's evaluation.

This is not the only problem with the administrative decision, however. It is simply not reasonable to equate the ability to walk forty feet up and down a hallway without getting short of breath with the ability to walk for six hours during a workday. Additionally, although the ALJ referred to plaintiff's "active lifestyle," apparently relying on isolated statements from a report filled out by plaintiff (Tr. 192-99) about his ability to hunt and play with his dog, a fair reading of that report indicates a very restricted lifestyle, with pain and shortness of breath affecting all of plaintiff's activities, including hunting, which he said he does by sitting only - he cannot walk - and which still causes pain. These reasons articulated by the ALJ do not provide a substantial basis for rejecting Dr. Ulrich's opinions in their entirety or assigning them little or no weight.

The only other reasons advanced by the ALJ for disregarding Dr. Ulrich's opinions are that his opinions are not supported by his own treatment notes and that he has expressed an opinion on an issue reserved to the Commissioner. The former reason fails Wilson's articulation requirement because the administrative decision does not identify any specific portion of any treatment note (and there are many such notes in the file, reflecting years of a treating relationship) which contain the supposed inconsistencies, nor what those inconsistencies are. In fact, the notes generally reflect that plaintiff was constantly reporting disabling pain, shortness of breath, or psychological symptoms, and that Dr. Ulrich was generally in agreement with plaintiff's own assessment of his abilities. There is just not enough explanation of this basis for the ALJ's decision to permit the type of "meaningful review" contemplated by Wilson.

-11-

The latter reason also fails. It is true that, at various points, Dr. Ulrich expressed a "broad" opinion of disability. However, in his physical capacity assessment form, he expressed very specific views about plaintiff's ability to perform various work-related functions, including sitting, standing, walking, lifting, pushing, pulling, climbing, and other matters pertinent to a residual functional capacity finding. The ALJ made no mention of these findings, nor did she provide any reasoned basis for rejecting them apart from the ones mentioned previously. These findings cannot be sloughed off as a statement of disability of the type reserved to the Commissioner; they are the quintessential type of conclusions reached by both treating and non-treating sources about physical abilities, made without reference to vocational factors, and the Commissioner has an obligation to confront them directly. That did not happen here.

What the ALJ must do in a case like this is to set forth adequate and well-supported reasons for giving less than controlling weight to the opinion of a treating source - which did not occur on this record - and then, if the treating source opinion is not deemed controlling, to continue to weigh that opinion in light of the other factors set forth in 20 C.F.R. §404.1527 in order to determine the proper weight to give that opinion. As the Court of Appeals has stated, "[i]f the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician." Blakley, supra, at 406. Because the administrative decision does not reflect this approach, the case must be remanded for further proceedings.

The Court also offers these comments on the way in which plaintiff's mental impairment was evaluated. Dr. Ulrich also expressed an opinion as to that aspect of plaintiff's ability to work. The ALJ rejected this opinion because Dr. Ulrich is not a mental health specialist - a valid reason - and because his assessment was inconsistent with "what the claimant reported to others, and with the other medical evidence." (Tr. 32). Again, this bare-bones rationale does not seem to satisfy <u>Wilson</u>'s articulation requirement because no details of these claimed inconsistencies were supplied. The same level of vagueness occurs in the ALJ's rejection of Dr. Rowland's opinion, making it difficult for the Court to understand exactly how the ALJ reached her conclusions about the plaintiff's mental residual functional capacity. On remand, the evidence concerning plaintiff's mental impairments should be reviewed, and any new decision must contain a more thorough explanation of the ALJ's conclusions on this issue.

## VII. <u>Recommended Decision</u>

Based on the above discussion, it is recommended that the plaintiff's statement of errors be sustained to the extent that the case be remanded to the Commissioner for further proceedings pursuant to 42 U.S.C. §405(g), sentence four.

## VIII. <u>Procedure on Objections</u>

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify,

in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge